UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>County of Sanilac, Michigan v. Purdue Pharma L.P., *et al.*<br><br>Case No. 1:18-op-45352-DAP | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster<br><br>**SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND** |

Plaintiff, County of Sanilac, Michigan ("Plaintiff"), submits this supplemental pleading and Amended Complaint incorporating as if fully set forth herein its own prior pleadings and the common factual allegations identified and the RICO causes of action included in the Corrected Second Amended Complaint and Jury Demand in the case of *The County of Summit, Ohio, et al., v. Purdue Pharma L.P., et al.,* Case No. 1:18-op-45090 ("Summit County Pleadings"), *In Re National Prescription Opiate Litigation,* in the United States District Court for the Northern District of Ohio, MDL Docket No. 513, 514[1]), and as may be amended in the future, and any additional claims asserted herein.  Plaintiff also hereby amends its Complaint to alter the defendants against which claims are asserted as identified below.

---

[1] Docket No. 513 is the redacted Summit Second Amended Complaint and Docket No. 514 is the unredacted Summit Corrected Second Amended Complaint filed under seal in Case No. 1:17-md-02804-DAP.  The redacted Summit Corrected Second Amended Complaint is also filed in its individual docket, Case No. 1:18-op-45090-DAP, Docket No. 24.

## INCORPORATION BY REFERENCE OF EXISTING COMPLAINT

1.      Plaintiff's Existing Complaint (Civil Action No. 1:18-op-45352-DAP,  Docket No.

1)  is expressly incorporated by reference to this Short Form as if fully set forth herein.

## PARTIES – DEFENDANTS

2.      Plaintiff asserts claims against the following Defendants:

   **a. All Defendants named in Plaintiff's Existing Complaint:**

- Purdue Pharma L.P.

- Cephalon, Inc., Teva Pharmaceutical Industries LTD., and Teva Pharmaceuticals USA, Inc.

- Endo International PLC and Endo Pharmaceuticals Inc.

- Janssen Pharmaceuticals, Inc.

- Insys Therapeutics, Inc.

- Mallinckrodt PLC and Mallinckrodt Pharmaceuticals.

- Allergan PLC f/k/a Actavis PLC, Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.

- AmerisourceBergen Corporation.

- Cardinal Health, Inc.

- McKesson Corporation.

- Omnicare Distribution Center LLC.

- Masters Pharmaceuticals, Inc.

- CVS Health Corporation.

- Walgreens Boots Alliance, Inc.

- Rite Aid Corporation.

- Costco Wholesale Corporation.

**b. The following Defendants not named in Plaintiff's Existing Complaint but named in the Summit County Pleadings:**

Plaintiff incorporates by reference all of the allegations set forth in the Summit County Pleadings relating to and against each of the defendants named below:

- Purdue Pharma, Inc. and Purdue Frederick Company, Inc.

- Endo Health Solutions, Inc.

- Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.

- Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Johnson & Johnson and Noramco, Inc.

- Allergan Finance LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.[2]

- Mallinckrodt LLC.

- SpecGx LLC.

- Anda, Inc.

- Walmart Inc. f/k/a Wal-Mart Stores, Inc.

**c. The following Defendants not named in Plaintiff's Existing Complaint or the Summit County Pleadings:**

Plaintiff names the following defendants not previously named in either Plaintiff's Existing Complaint or the Summit County Pleadings:

- Richard S. Sackler.

- Jonathan D. Sackler.

- Mortimer D.A. Sackler.

- Kathe A. Sackler.

---

[2] The list of Allergan-related entities shall be understood to incorporate all affiliates that owned, manufactured, distributed, monitored, or sold opioid medicines at issue, including: Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA, Inc.; Warner Chilcott Company, LLC; Watson Laboratories, Inc.; Actavis Elizabeth LLC; Actavis Pharma, Inc.; Actavis LLC; Actavis Mid-Atlantic LLC; Actavis Kadian LLC; Actavis Totowa LLC; Actavis South Atlantic LLC; Actavis Laboratories UT, Inc.; and Actavis Laboratories FL, Inc.

- Ilene Sackler Lefcourt.

- Beverly Sackler.

- Theresa Sackler.

- David A. Sackler.

- Trust for the Benefit of Members of the Raymond Sackler Family.

- Rhodes Pharmaceuticals L.P.

- Mylan N.V. f/k/a Mylan Inc.; Mylan Pharmaceuticals Inc.

- Novartis AG; Sandoz International GmbH; Sandoz Inc.

- Walgreens Co.

- Rite-Aid of Michigan, Inc.

- Woodward Detroit CVS, LLC.

**d.  Claims asserted against each and all of the above-listed Defendants:**

All of the Causes of Action asserted in Plaintiff's Existing Complaint are incorporated by reference herein.  The first Cause of Action (Public Nuisance), second Cause of Action (Negligence Per Se), and third Cause of Action (Negligence) in Plaintiff's Existing Complaint are asserted against all of the identified defendants listed above.  The fourth Cause of Action (Violations of the Racketeer Influenced and Corrupt Organizations Act)  in Plaintiff's Existing Complaint are asserted against the following defendants:

- Purdue Pharma L.P., Purdue Pharma, Inc., Purdue Frederick Company, Inc. and Rhodes Pharmaceuticals L.P.

- Cephalon, Inc., Teva Pharmaceutical Industries LTD., and Teva Pharmaceuticals USA, Inc.

- Endo International PLC, Endo Pharmaceuticals Inc. and Endo Health Solutions, Inc.

- Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.

- Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceuticals, Inc., Johnson & Johnson and Noramco, Inc.

- Insys Therapeutics, Inc.

4

- Mallinckrodt PLC, Mallinckrodt LLC, Mallinckrodt Pharmaceuticals and SpecGx LLC.

- Allergan Finance LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Allergan PLC f/k/a Actavis PLC, Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.

- AmerisourceBergen Corporation.

- Cardinal Health, Inc.

- McKesson Corporation.

- Omnicare Distribution Center LLC.

- Masters Pharmaceuticals, Inc.

- Anda, Inc.

- Richard S. Sackler.

- Jonathan D. Sackler.

- Mortimer D.A. Sackler.

- Kathe A. Sackler.

- Ilene Sackler Lefcourt.

- Beverly Sackler.

- Theresa Sackler.

- David A. Sackler.

- Trust for the Benefit of Members of the Raymond Sackler Family.

In addition, Plaintiff adopts the Summit County Pleadings First Claim for Relief (Violation of Racketeer Influenced and Corrupt Organizations Act) against the following defendants:

- Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company, Inc.

- Cephalon, Inc., Teva Pharmaceutical Industries, Ltd., and Teva Pharmaceuticals USA, Inc.

- Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Johnson & Johnson and Janssen Pharmaceuticals, Inc.

- Endo Health Solutions, Inc., Endo International PLC and Endo Pharmaceuticals Inc.

- Mallinckrodt LLC, Mallinckrodt PLC, Mallinckrodt Pharmaceuticals and SpecGx LLC.

In addition, Plaintiff adopts the Summit County Pleadings Second Claim for Relief (Violation of Racketeer Influenced and Corrupt Organizations Act) against the following defendants:

- Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company, Inc.

- Cephalon, Inc., Teva Pharmaceutical Industries, Ltd., and Teva Pharmaceuticals USA, Inc.

- Endo Health Solutions, Inc., Endo International PLC and Endo Pharmaceuticals Inc.

- Mallinckrodt LLC, Mallinckrodt PLC, Mallinckrodt Pharmaceuticals and SpecGx LLC.

- Allergan Finance LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Allergan PLC f/k/a Actavis PLC, Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.

- AmerisourceBergen Corporation.

- Cardinal Health, Inc.

- McKesson Corporation.

**I, Jaime M. Farrell, Counsel for Plaintiff(s), certify that in identifying all Defendants, I have followed the procedure approved by the Court and reviewed the ARCOS data that I understand to be relevant to Plaintiff(s).**

**I further certify that, except as set forth below, each of the Defendant(s) newly added herein appears in the ARCOS data I reviewed.**

I understand that for each newly added Defendant not appearing in the ARCOS data I must set forth below factual allegations sufficient to state a claim against any such newly named Defendant that does not appear in the ARCOS data.

The following newly added Defendant(s) *do not appear* in the ARCOS data I reviewed:

- Endo Health Solutions, Inc.

- Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Johnson & Johnson and Noramco, Inc.

- Mallinckrodt LLC.

- Anda, Inc.

- Walgreens Co.

- Woodward Detroit CVS, LLC.

- Richard S. Sackler.

- Jonathan D. Sackler.

- Mortimer D.A. Sackler.

- Kathe A. Sackler.

- Ilene Sackler Lefcourt.

- Beverly Sackler.

- Theresa Sackler.

- David A. Sackler.

- Trust for the Benefit of Members of the Raymond Sackler Family.

- Rhodes Pharmaceuticals L.P.

**Dated:** 3/16/2019 _____     **Signed:** */s/ Jaime M. Farrell* _____

Factual Allegations Regarding Individual Defendants

    2.1    *See Attachment A.*

## COMMON FACTUAL ALLEGATIONS

3.      By checking the boxes in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the Summit County Pleadings as identified in the Court's Order implementing the Short Form procedure. Docket No. 1282.

⊠  Common Factual Allegations (Paragraphs 130 through 670 and 746 through 813)
⊠  RICO Marketing Enterprise Common Factual Allegations  (Paragraphs 814-848)
⊠  RICO Supply Chain Enterprise Common Factual Allegations  (Paragraphs 849-877)

4.      If additional claims are alleged below that were not pled in Plaintiff's Existing Complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here.  Plaintiff(s) assert(s) the following additional facts to support the claim(s) identified in Paragraph 6 below (below or attached):

_____

_____

_____

_____

## CLAIMS

5.      The following federal **RICO causes of action** asserted in the Summit County Pleadings as identified in the Court's implementing order and any subsequent amendments, Docket No. 1282, are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff(s)'s Existing Complaint (check all that apply):[3]

⊠  First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Marketing Enterprise (Against Defendants Purdue, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (Summit County Pleadings, Paragraphs 878-905)

⊠  Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (Summit County Pleadings, Paragraphs 906-938)

6.      Plaintiff asserts the following **additional claims** as indicated (below or attached):

_____

_____

_____

[3] Plaintiff incorporates by reference the fourth Cause of Acton for Violation of the Racketeer Influenced and Corrupt Organizations Act from Plaintiff's Existing Complaint.

---

---

7.      To the extent Plaintiff(s) wish(es) to **dismiss claims** previously asserted in Plaintiff(s)'s Existing Complaint, they are identified below and will be dismissed without prejudice.

---

---

---

---

WHEREFORE, Plaintiff(s) prays for relief as set forth in the Summit County Pleadings in *In Re National Prescription Opiate Litigation* in the United States District Court for the Northern District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

Dated: 3/16/2019                              */s/ Paul J. Pennock*
                                                                *Attorney for Plaintiff(s)*


                                                                Paul J. Pennock
                                                                Ellen Relkin
                                                                **WEITZ & LUXENBERG, P.C.**
                                                                700 Broadway
                                                                New York, NY 10003
                                                                Tel: (212) 558-5500
                                                                Email: ppennock@weitzlux.com
                                                                Email: erelkin@weitzlux.com

                                                                Paul F. Novak
                                                                **WEITZ & LUXENBERG, P.C.**
                                                                Fisher Building
                                                                3011 West Grand Boulevard
                                                                Suite No. 2150
                                                                Detroit, MI 48202
                                                                Tel: (313) 800-4170
                                                                Email: pnovak@weitzlux.com

                                                                *Counsel for Plaintiff*

# Attachment A

## I.  THE IDENTIFICATION OF NEWLY NAMED DEFENDANTS

### A.  Defendants Not Named in Either Plaintiff's Existing Complaint or the Summit County Pleadings

1.  The following defendants, named pursuant to ¶2.1 of the Short Form for Supplementing Complaint and Amending Defendants and Jury Demand, do not appear in Plaintiff's Existing Complaint, the Summit County Pleadings, or the ARCOS data.

2.  Defendant Richard S. Sackler is a natural person residing in Travis County, Texas. He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

3.  Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

4.  Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

5.  Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut. She has served as a member of the Board of Directors of Purdue and Purdue- related entities since the 1990's.

6.  Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York. She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

7.  Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut. She has served as a member of the Board of Directors of Purdue and Purdue- related entities since the 1990's.

8.    Defendant Theresa Sackler is a natural person residing in New York County, New York. She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990's.

9.    Defendant David A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since 2012.

10.   Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust for which Defendants Beverly Sackler, Richard S. Sackler and/or Jonathan D. Sackler are trustees. It is the 50% direct or indirect beneficial owner of Purdue and the Purdue-related entities and the recipient of 50% of the profits from the sale of opioids by Purdue and Purdue-related entities.  Collectively, the defendants listed in ¶¶2-10 are referred to as the "Sackler Defendants" or "Sackler Families."

11.   Defendant Rhodes Pharmaceuticals L.P. ("Rhodes") is a Delaware limited partnership formed in or around 2007 with headquarters located in Coventry, Rhode Island.

12.   Defendant Mylan N.V. f/k/a Mylan Inc. is a global pharmaceutical company incorporated in the Netherlands that maintains its headquarters in Canonsburg, Pennsylvania. Defendant Mylan Pharmaceuticals Inc. (together with Mylan N.V., "Mylan") is based in Canonsburg, Pennsylvania and operates as a subsidiary of Mylan N.V.  Mylan manufactures, markets, and sells prescription opioids throughout the United States, including in and around the County of Sanilac.

13.   Defendant Novartis AG, headquartered in Basel, Switzerland, researches, develops, manufactures, and markets healthcare products, including pharmaceuticals, worldwide.

Sandoz International GmbH is based in Holzkirchen, Germany, operates as a subsidiary of Novartis, and serves customers worldwide by developing, marketing, and selling biosimilar generic pharmaceuticals, among other products.  Sandoz Inc., based in Princeton, New Jersey and formerly known as Geneva Pharmaceuticals Techonology Corporation, operates as a subsidiary of Sandoz International, and develops, manufactures, markets, and distributes generic pharmaceutical products.  Sandoz Inc., Sandoz International, and Novartis are referred to herein as "Sandoz."  During the relevant time period, Sandoz manufactured, marketed, and sold prescription opioids throughout the United States, including in and around the County of Sanilac.

14.  Defendant Walgreens Company is a wholly-owned operating subsidiary of Walgreens Boots Alliance, incorporated in the State of Illinois with its headquarters and principal place of business in Deerfield, Illinois.

15.  Defendant Rite Aid of Michigan, Inc. is a Michigan corporation with its headquarters and principal place of business located in Camp Hill, Pennsylvania.  Rite Aid of Michigan, Inc. is a citizen of Pennsylvania for purposes of diversity of citizenship.

16.  Upon information and belief, Defendant Woodward Detroit CVS, LLC is a Michigan limited liability company and wholly-owned operating subsidiary of CVS Health, incorporated in the State of Rhode Island with its headquarters and principal place of business in Woonsocket, Rhode Island.  Woodward Detroit CVS, LLC is a citizen of Rhode Island for purposes of diversity of citizenship.

**B.  Defendants Not Previously Named in Plaintiff's Existing Complaint but Named in the Summit County Pleadings**

17.  The following defendants not named in Plaintiff's Existing Complaint, but are named in the Summit County Pleadings, *The County of Summit, Ohio, et al., v. Purdue Pharma*

*L.P., et al.*, Case No. 1:18-op-45090 ("Summit County Pleadings"), *In Re National Prescription Opiate Litigation*, in the United States District Court for the Northern District of Ohio (Docket Nos. 513-514). Plaintiff incorporates by reference all of the allegations set forth in the Summit County Pleadings relating to and against each of the defendants named below:

- Purdue Pharma, Inc. and Purdue Frederick Company, Inc.

- Endo Health Solutions, Inc.

- Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.

- Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Johnson & Johnson and Noramco, Inc.

- Allergan Finance LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.

- Mallinckrodt LLC.

- SpecGx LLC.

- Anda, Inc.

- Walmart Inc. f/k/a Wal-Mart Stores, Inc.

**C. Clarification on Previously Defined Terms**

18. All terms collectively identifying groups of defendants defined in either Plaintiff's Existing Complaint and the Summit County Pleadings are incorporated by reference herein.

19. To the extent a term referring to an individual defendant or group of defendants is defined differently in Plaintiff's Existing Complaint and the Summit County Pleadings, such term shall be understood to include all of the subsidiary defendants grouped under that term as defined in both of the complaints. For example, if the term "Defendant A" was defined in Plaintiff's Existing Complaint to include Subdefendant 1 and Subdefendant 2, but was defined in the Summit County Pleadings to include Subdefendant 1 and Subdefendant

14

3, "Defendant A" is now defined to include Subdefendant 1, Subdefendant 2, and Subdefendant 3.

20. In addition, the following previously defined terms shall be expanded to also include the following defendants not previously named in either Plaintiff's Existing Complaint or the Summit County Pleadings:

>    (a) "Purdue" shall now be understood to also include Rhodes Pharmaceuticals L.P.

## II. JURISDICTION

21. This Court has subject matter jurisdiction over this action in accordance with 28 U.S.C. § 1332(a). Complete diversity exists between Plaintiff (a citizen of the State of Michigan) and Defendants (citizens of states other than Michigan). The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO Act"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related to Plaintiff's federal law claims that the claims form part of the same case or controversy.

23. This is a judicial district where the above-named defendants are subject to personal jurisdiction in accordance with 28 U.S.C. §1331 and Mich. Comp. Laws § 600.705, the Michigan long-arm statute. Each of the defendants identified in Section I. above purposefully availed themselves of the benefits, profits and privileges deriving from their business activities in this State.

24. Each of the above-listed defendants also regularly engages in business within the State of Michigan and within this District. Each defendant has committed tortious acts that have caused injury to the County of Sanilac. Each defendant expects, or should reasonably have expected, those acts to have consequences in the State of Michigan and in the County of Sanilac. Moreover, each defendant solicited business within this District, engaged in persistent courses of conduct here and derived substantial revenue from goods used and services rendered in the State of Michigan and the County of Sanilac through interstate commerce.

25. Each defendant is regularly engaged in the business of manufacturing and distributing prescription opioids, either directly or indirectly through third-party related entities, in the State of Michigan and, specifically, in the County of Sanilac. Each defendant's activities in the County of Sanilac in connection with the manufacture and distribution of prescription opioids were, and are, continuous and systematic and give rise to the causes of action alleged herein.

26. At all relevant times, each defendant expected or should have expected that their acts would have consequences within the United States of America and, specifically, the States of Michigan and within this District.

27. Defendant CVS Health Corporation ("CVS Health") and Defendant Woodward Detroit CVS, LLC were, and are, the agents, representatives, joint venturers, alter egos, co-conspirators, consultants, predecessors, successors, servants, and/or employees of each other.

28. In doing the acts alleged herein, Defendant CVS Health and Defendant Woodward Detroit CVS, LLC were, and are, acting in the course and scope of such agency, representation,

joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence and ratification of each other.

29. Defendant CVS Health sells opioids for profit in the State of Michigan, through its wholly owned subsidiary sales agents and retail distributor agent, Defendant Woodward Detroit CVS, LLC.

30. Defendant Woodward Detroit CVS, LLC, as the sales agent, retail distributor agent and alter-ego of Defendant CVS Health, transacts business by retail sale and distribution of opioids in the United States of America and, specifically, the State of Michigan and this District at the direction of Defendant CVS Health and/or which is ratified by Defendant CVS Health.

31. Defendant CVS Health has purposefully availed itself of the privilege of retail sale and distribution of opioids in the United States of America and, specifically, the State of Michigan and this District by directing its wholly owned subsidiary, Defendant Woodward Detroit CVS, LLC to sell opioids in the State of Michigan and this District.

32. Defendant CVS Health sells opioids through Defendant Woodward Detroit CVS, LLC, who serves as Defendant CVS Health's sales agent and retail distributor agent in the state of Michigan for purposes of this Court's exercise of personal jurisdiction over Defendant CVS Health.

33. The activities of Defendant Woodward Detroit CVS, LLC are imputed to Defendant CVS Health for purposes of minimum contacts necessary for this Court to exercise personal jurisdiction over Defendant CVS Health under the Michigan Long-Arm statute.

34. As a result of this imputed activity in the State of Michigan and this District, it is reasonable for Defendant CVS Health to anticipate being subject to litigation in the State

of Michigan and this District, and for this Court to exercise personal jurisdiction over Defendant CVS Health as comporting with fair play and substantial justice.

35. Defendant Walgreens Boots Alliance, Inc. ("Walgreens Boots Alliance") and Defendant Walgreens Co. were, and are, the agents, representatives, joint venturers, alter egos, co-conspirators, consultants, predecessors, successors, servants, and/or employees of each other.

36. In doing the acts alleged herein, Defendant Walgreens Boots Alliance and Defendant Walgreens Co. were, and are, acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence and ratification of each other.

37. Defendant Walgreens Boots Alliance sells opioids for profit in the State of Michigan and this District, through its wholly owned subsidiary sales agent and retail distributor agent, Defendant Walgreens Co.

38. Defendant Walgreens Co., as the sales agent, retail distributor agent and alter-ego of Defendant Walgreens Boots Alliance, transacts business by retail sale and distribution of opioids in the United States of America and, specifically, the State of Michigan and this District at the direction of Defendant Walgreens Boots Alliance and/or which is ratified by Defendant Walgreens Boots Alliance.

39. Defendant Walgreens Boots Alliance has purposefully availed itself of the privilege of retail sale and distribution of opioids in the United States of America and, specifically, the State of Michigan and this District by directing its wholly owned subsidiary, Defendant Walgreens Co., to sell opioids in the State of Michigan and this District.

40.    Defendant Walgreens Boots Alliance sells opioids through Defendant Walgreens Co., who serves as Defendant Walgreens Boots Alliance's sales agent and retail distributor agent in the State of Michigan and this District for purposes of this Court's exercise of personal jurisdiction over Defendant Walgreens Boots Alliance.

41.    The activities of Defendant Walgreens Co. are imputed to Defendant Walgreens Boots Alliance for purposes of minimum contacts necessary for this Court to exercise personal jurisdiction over Defendant Walgreens Boots Alliance under the Michigan Long-Arm statute.

42.    As a result of this imputed activity in the State of Michigan and this District, it is reasonable for Defendant Walgreens Boots Alliance to anticipate being subject to litigation in the State of Michigan and this District, and for this Court to exercise personal jurisdiction over it as comporting with fair play and substantial justice.

43.    Defendant Rite Aid Corporation ("Rite Aid Corp.") and Defendant Rite Aid of Michigan, Inc. were, and are, the agents, representatives, joint venturers, alter egos, co-conspirators, consultants, predecessors, successors, servants, and/or employees of each other.

44.    In doing the acts alleged herein, Defendant Rite Aid Corp. and Defendant Rite Aid of Michigan, Inc. were, and are, acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence and ratification of each other.

45.    Defendant Rite Aid Corp. sells opioids for profit in the State of Michigan, through its wholly owned subsidiary sales agent and retail distributor agent, Defendant Rite Aid of Michigan, Inc.

46.   Defendant Rite Aid of Michigan, Inc., as the sales agent, retail distributor agent and alter-ego of Defendant Rite Aid Corp., transacts business by retail sale and distribution of opioids in the United States of America and, specifically, the State of Michigan at the direction of Defendant Rite Aid Corp. and/or which is ratified by Defendant Rite Aid Corp.

47.   Defendant Rite Aid Corp. has purposefully availed itself of the privilege of retail sale and distribution of opioids in the United States of America and, specifically, the State of Michigan by directing its wholly owned subsidiary, Defendant Rite Aid of Michigan, Inc., to sell opioids in the State of Michigan.

48.   Defendant Rite Aid Corp. sells opioids through Defendant Rite Aid of Michigan, Inc. who serves as Defendant Rite Aid Corp.'s sales agent and retail distributor agent in the state of Michigan for purposes of this Court's exercise of personal jurisdiction over Defendant Rite Aid Corp.

49.   The activities of Defendant Rite Aid of Michigan, Inc., are imputed to Defendant Rite Aid Corp. for purposes of minimum contacts necessary for this Court to exercise personal jurisdiction over Defendant Rite Aid Corp. under the Michigan Long-Arm statute.

50.   As a result of this imputed activity in the States of Ohio and Michigan, it is reasonable for Defendant Rite Aid Corp. to anticipate being subject to litigation in Ohio and Michigan, and for this Court to exercise personal jurisdiction over it as comporting with fair play and substantial justice.

## III. FACTUAL ALLEGATIONS CONCERNING THE NEWLY ADDED DEFENDANTS THAT DO NOT APPEAR IN THE ARCOS DATA

### A.  The Individual Sackler Defendants Direct and Control Purdue

51.  Richard Sackler is one of the six inventors listed on the original patent for OxyContin.  He began working for Purdue in the 1970's as an assistant to his father, Raymond Sackler, who served as the president of the company at that time.  Richard rose through leadership in the subsequent decades, serving as President of Purdue from 1999 to 2003.

52.  Richard Sackler resigned from his role in 2003 over apparent worry that executive officers of Purdue would be held personally liable for any opioid-related liabilities.  He continued to serve as co-chair of Purdue's board with his uncle, Mortimer Sackler.  This allowed the Sackler Defendants to retain control of the company regardless of their involvement at the executive level.

53.  During his executive tenure at Purdue, Richard Sackler actively participated in nearly every aspect of the company's opioid products, from invention to marketing to sale.  With the assistance of his father, Raymond, and his uncle, Mortimer, Richard introduced OxyContin to the market with one of the largest pharmaceutical advertising campaigns in history.  Within five years, OxyContin was earning Purdue $1 billion a year.

54.  At all relevant times, Richard Sackler served as trustee of one or more trusts that own and control Purdue or Purdue-associated companies.   He is the direct or indirect beneficiary of some portion of 25% of the profits earned from the sale of opioids by Purdue and the Purdue-associated companies listed herein.

55.  Jonathan Sackler served as Senior Vice President of Purdue by 2000. Like Richard, his brother, Jonathan resigned from his position in or after 2003, due to concerns that the executive officers of Purdue would be personally liable for crimes and litigation

stemming from Purdue's opioid products. Jonathan continued to serve on Purdue's board after his resignation.

56. At all relevant times, Jonathan Sackler served as trustee of one or more trusts that own and control Purdue or Purdue-associated companies. He is the direct or indirect beneficiary of some portion of 25% of the profits earned from the sale of opioids by Purdue and the Purdue- associated companies listed herein.

57. Mortimer Sackler is the direct or indirect beneficiary of 7.14% of the profits earned from the sale of opioids by Purdue and the Purdue-associated companies listed herein Kathe Sackler began serving as Senior Vice President of Purdue by 2000. She resigned from her position in or about 2003 due to concerns that the executive officers of Purdue could be held personally liable for crimes and litigation stemming from Purdue's opioid products. She continued to serve on Purdue's board. She is the direct or indirect beneficiary of 7.14% of the profits earned from the sale of opioids by Purdue and the Purdue-associated companies listed herein.

58. Ilene Sackler Lefcourt served as Vice President of Purdue during the initial development and launch of OxyContin. She, too, resigned from her position around 2003 due to concerns of personal liability for executive officers of Purdue for opioid-related crimes and litigation but continued to serve on the board.

59. Beverly Sackler has served on the Board of Directors of Purdue and associated entities since the 1990's. She serves as the trustee of one or more trusts that own or control Purdue and Purdue-associated companies, and to which 50% of the profits of the companies' sale of opioids have been conveyed. She is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue through the sale of opioids.

60.  Theresa Sackler has served on the Board of Directors of Purdue and associated entities since the 1990's.  She is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue through the sale of opioids.

61.  David Sackler has served on the Board of Directors of Purdue and associated entities since 2012.  He is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue through the sale of opioids.

62.  Richard Sackler, Jonathan Sackler, Mortimer Sackler, Kathe Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David Sackler and the Raymond Sackler Trust (through its trustees) each knowingly aided, participated in and benefited from the unlawful conduct of Purdue.

**B.  The Sackler Defendants Oversee and Direct Purdue's Unlawful Conduct**

63.  Prior to Purdue's entry into the opioid market, the general standard use of opioids was for short-term periods, for example: acute pain, surgery recovery, cancer and palliative care. Chances of opioid abuse are low when applied in this manner.  Purdue went to great effort to influence public perception of the perceived benefits and risks of long-term opioid use.

64.  Arthur Sackler, the brother of Raymond and Mortimer Sackler, is largely responsible for this change in public perception, effectively creating the pharmaceutical advertising industry.  He realized that direct advertising to doctors and prescribers would be the most effective means of turning a profit.  He paid prominent doctors to endorse his products, offered physicians perks and benefits, published marketing material disguised as neutral medical journal articles and funded "education" seminars that extolled the virtues of his drug products.  His deceptive and unethical marketing techniques led to

23

Valium becoming the first hundred- million-dollar,  then  billion-dollar,  prescription  drug and  set  the  precedent  for  the  current problems with pharmaceutical marketing.

65. The Sackler Defendants have continued to direct Purdue's unlawful marketing techniques, using many of the same unethical techniques developed by Arthur Sackler, in order to maximize their sales of opioid products.

66. OxyContin was launched with one of the largest pharmaceutical marketing campaigns in history,  with  roughly  1,000  sales  representatives  touting  the  drug's  benefits. Representatives  would  recommend  OxyContin  as the solution not just for acute, short-term pain but also for  less-acute, longer-lasting pain.  Sales  training  included  lessons in   overcoming  doctors'  concerns  about  health  and  addiction  by  minimizing  or downplaying OxyContin's true qualities.  Purdue paid thousands of physicians to present to medical conferences on the benefits of OxyContin.

67. Upon information and belief, members of the Sackler Families were deeply involved in  OxyContin's  marketing  campaign.  Family  members  were  on  site  at  Purdue's headquarters daily, controlling the management of the family business.  According to a former sales representative, Richard Sackler was "the dude that made it happen."   In response to the concerns of benefit plans that OxyContin was ripe for addictive use, Richard sent an e-mail to sales representatives, asserting that "'addiction' may be a convenient way to just say 'NO.'"[4]

68. According to e-mails obtained by the Massachusetts Attorney General ("AG"),the Sacklers considered whether they could sell OxyContin as "non-narcotic," without the safeguards that protect patients from addictive drugs, which would result in a "vast

---

[4] Radden Keefe, *The Family that Built an Empire of Pain*, The New Yorker (Oct. 30, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of- pain.

increase of the market potential."[5] The inventor of OxyContin, Robert Kaiko ("Kaiko"), wrote to Richard Sackler that he was "very concerned" about the danger of selling OxyContin without strict controls.   Kaiko warned: "I don't believe we have a sufficiently strong case to argue that OxyContin has minimal or no abuse liability."   To the contrary, Kaiko wrote, "oxycodone containing products are still among the most abused opioids in the U.S."   Kaiko predicted: "If OxyContin is uncontrolled, . . . it is highly likely that it will eventually be abused."   Richard Sackler responded: "How substantially would it improve your sales?"[6]

69.    In 1997, Richard and Kathe Sackler took part in a conspiracy to mislead doctors by claiming oxycodone was half as strong as morphine when the opposite was the case. Purdue engaged in this deception to alleviate the fears of medical professionals in prescribing the drug for non-acute pain.  As recorded in internal correspondence obtained by the Massachusetts AG, Richard Sackler directed Purdue staff not to tell doctors the truth because the truth could reduce OxyContin sales.[7]

70.    Around 1999 to 2003, Purdue had a system whereby company e-mails would self- erase after pre-determined times.   This policy created a system whereby potentially incriminating documents would be automatically erased even if received by third parties. Richard, Jonathan and Kathe Sackler were all aware and supportive of this system.

---

[5] *Commonwealth of Mass. v. Purdue Pharma L.P., et al.*, C.A. No. 1884-cv-01808 (BLS2), First  Amended Complaint, Complete Unredacted Corrected Version for  the  Public  File Submitted According to Court Order January 31, 2019, ¶174 (Mass. Super. Ct. Jan. 31, 2019) (hereinafter, "*MA AG Complaint*").
[6] *Id.*
[7] *Id.*, ¶176.

**C.  The Sackler Families Were Aware of the Abuse Potential of OxyContin from No Later than Summer 1999**

71.  Purdue and members of the Sackler Families were aware that OxyContin and other prescription medication could lead to addiction since at least summer 1999.  An internal memorandum prepared by Purdue employee Maureen Sara described the abuse and recreational use of OxyContin.  The memorandum was sent directly to Purdue's board members, including Richard, Jonathan and Kathe Sackler.

72.  In spite of the 1999 memorandum, Purdue President Michael Friedman testified before the U.S. House of Representatives in 2001 that Purdue had not become aware of OxyContin's potential for abuse until 2000.  No members of the Sackler Families attempted to correct this false narrative.

73.  The Sackler Defendants were thus aware of potential liability for Purdue since at least 1999 due to OxyContin's addictive nature.  Instead of attempting to fix or solve the issue they had created, the Sackler Defendants began to transfer profits from Purdue and associated companies to their own private trusts and accounts in order to shield their funds from creditors.  In 2015, for example, the Sackler Families removed $700 million from their privately held companies, two-thirds of which came from Purdue.  These transfers of ill-gotten gains were and are fraudulent, unjustly enriched the Sackler Defendants and were done for the purpose of protecting the money from any civil or criminal judgment against Purdue for its participation in the opioid crisis.  These transfers also left Purdue and its associated entities undercapitalized and potentially unable to pay a judgment against them in this litigation.

74.  Rather than protect the public's health once they became aware of OxyContin's potential for abuse, the Sackler Families protected their own wealth.

D. **The Sackler Families Are "Covered Persons" Under a Corporate Integrity Agreement with the U.S. Government and Established Rhodes as a "Landing Pad" in Case They Needed to Depart Purdue**

75. The liability of the Sackler Defendants extends beyond their mere leadership of Purdue. They were aware of, and obligated to address, Purdue's conduct due to previous investigations into the company's deceptive practices.

76. Purdue Pharma Inc. and Purdue Pharma L.P. were under investigation by 26 states and the U.S. Department of Justice ("DOJ") from 2001 to 2007.  In 2003, on the advice of legal counsel, every Sackler who held an executive role at Purdue resigned to avoid personal liability for the conduct in which they had engaged and continued to engage prior to and after their resignations.

77. In 2007, the directors of Purdue Pharma Inc. declared that it would pay roughly $700 million and plead guilty to a felony for misleading doctors and patients about opioid medications.  (The company that paid the money, The Purdue Frederick Company Inc., was a separate corporate entity that was controlled by the same people and shared the same headquarters as Purdue Pharma L.P.)  The company acknowledged that its supervisors and employees had fraudulently promoted OxyContin as safer and less addictive than other pain medications.

78. Michael Friedman, the Chief Executive Officer ("CEO") of Purdue, pled guilty to criminal charges of fraudulent marketing.  Howeard Udell, Purdue's chief lawyer, and Paul Goldenheim, Purdue's chief medical officer, pled guilty to the same crime.  The directors, including members of the Sackler Families, were forced to choose a new CEO; and the felony convictions resulted in mass-scale retraining of company employees.

79. The 2007 convictions warned the directors against any further deception.

80. The directors also agreed to a Consent Judgment that ordered Purdue not to make any false or misleading oral or written claims about OxyContin, including concerning the risk of addiction. The Consent Judgment also required Purdue to establish a program that would identify high-prescribing doctors, stop promoting OxyContin to them and report them. This program was to last from 2007 to 2017.

81. The directors also entered a Corporate Integrity Agreement with the U.S. government, wherein Purdue would appoint a compliance officer to a senior management position at Purdue. The officer would make periodic reports on compliance matters to the board to ensure no deception took place again. Under the agreement, the directors and CEO were "Covered Persons" who had to comply with rules prohibiting deception regarding Purdue's products. This status lasted from 2007 to 2012 and required that leadership report all rule violations and undergo hours of compliance training. The directors and CEO were warned of consequences in case of a violation and certified that they understood their new status.

82. In or around November 2007, in the immediate aftermath of the guilty plea by Purdue and its executives regarding the company's false and misleading marketing of OxyContin, the Sackler Defendants established Rhodes Pharmaceuticals L.P. ("Rhodes"). According to a former senior manager at Purdue, "Rhodes was set up as a 'landing pad' for the Sackler family in 2007, to prepare for the possibility that they would need to start afresh following the crisis then engulfing OxyContin."[8]

83. The Sacklers' involvement in Rhodes and its relationship to Purdue was not publicly known until the September 9, 2018 publication of an article in the *Financial Times*.

---

[8] David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

According to the article, "Rhodes has not been publicly connected to the Sackler family before, and their ownership of the company may weaken one of their longstanding defences: that they cannot be held responsible for the opioid crisis because Purdue accounts for a small fraction of the overall prescriptions."[9]

84. Despite being registered as a separate company from Purdue, staff from Rhodes and Purdue use the same employee handbook and "little distinction is made internally between the two companies."[10]

85. Rhodes manufactures, markets, sells and distributes opioids in the State of Michigan and nationwide.

86. According to the *Financial Times*, in 2016, Rhodes had a substantially larger share of prescriptions in the U.S. prescription opioid market than Purdue.[11]

87. According to public records collected by ProPublica, in 2015 alone, Medicare Part D paid $4.1 million for claims arising from Michigan physicians' generic hydromorphone hydrochloride prescriptions, $102.7 million for claims arising from Michigan physicians' generic hydrocodone bitartrate/acetaminophen prescriptions, $38.3 million for claims arising from Michigan physicians' generic oxycodone/acetaminophen prescriptions, $34.4 million for claims arising from Michigan physicians' generic extended release morphine sulfate prescriptions and $18.1 million for claims arising from Michigan physicians' generic oxycodone hydrochloride prescriptions.

---

[9] *Id.*
[10] *Id.*
[11] *Id.*

### E. Even After DOJ Intervention, the Sackler Families Continued to Oversee Purdue's Wrongdoing

88. Regardless, even after establishing Rhodes as a "landing pad," being subjected to hundreds of millions of dollars in fines, and agreeing to a Corporate Integrity Agreement, the Sackler Families continued to oversee Purdue's wrongdoing.

89. Purdue's directors were clearly aware of their obligations under the above agreements. In 2009, Purdue had to report to the Inspector General of the U.S. Department of Health and Human Services ("HHS") that it had not immediately trained a new director on the terms of the Corporate Integrity Agreement. Purdue assured the government that the director had undergone the training the day after Corporate Compliance had learned of the issue.

90. The years after the 2007 guilty plea and Corporate Integrity Agreement were filled with alarming reports and stories about the opioid crisis. However, in spite of these widespread warnings, Purdue's directors, including members of the Sackler Families, did nothing to stop Purdue's misconduct. Instead, they continued to concern themselves with how to protect their wealth.

91. According to documents obtained by the Massachusetts AG, in April 2008, Richard Sackler sent Kathe, Ilene, David, Jonathan and Mortimer Sackler a secret memorandum about how to keep money flowing to their family.[12] Richard wrote that it was crucial to install a CEO who would be loyal to the family: "People who will shift their loyalties rapidly under stress and temptation can become a liability from the owners' viewpoint." Richard Sackler recommended John Stewart ("Stewart") for CEO because

---

[12] *MA AG Complaint*, ¶237.

of his loyalty.  He also proposed that the family should either sell Purdue in 2008 or, if they could not find a buyer, milk the profits out of the business and "distribute more free cash flow" to themselves.[13]

92.   That month, the Sacklers voted to have Purdue pay their family $50,000,000.[14]

93.   From the 2007 convictions until 2018, the Sacklers reportedly voted dozens of times to pay out Purdue's opioid profits to their family – in total more than **four billion dollars**.[15]

94.   In 2008, opioid overdoses killed more Americans in that year than any year prior.

95.   In 2009, the *American Journal of Public Health* published "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy."[16]  The article detailed the misleading and deceptive nature of Purdue's opioid marketing, including the misuse of sales representatives, the targeting of high-prescribing practitioners and deception about the potential rates of abuse.   The CDC reported that deaths stemming from opioid use had tripled in the preceding year.

96.   In 2010, *Time* magazine published "The New Drug Crisis: Addiction by Prescription."[17]  The article focused extensively on Purdue's line of opioid products.  Overdoses were the number one cause of accidental death in 15 states that year, and Purdue's directors were informed that Purdue would not be able to get product liability insurance to cover OxyContin.

---

[13] *Id.*
[14] *Id.*, ¶238.
[15] *Id.*
[16] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am. J. Pub. Health 221-27 (Feb. 2009).
[17] Jeffrey Kluger, *The New Drug Crisis: Addiction by Prescription*, TIME (Sept. 17, 2010), http://content.time.com/time/magazine/article/0,9171,2015763,00.html.

97. In 2011, the White House announced that prescription drug abuse was the nation's fastest-growing drug problem and called for educating healthcare providers about prescription drug abuse to prevent overprescription. The Centers for Disease Control and Prevention ("CDC") announced that prescription opioid overdoses had reached never-before- seen levels and specifically called out Purdue's line of opioid products. *Fortune* magazine published an article that same year where Purdue executives were interviewed about the ongoing crisis and the involvement of the company and the Sackler Families. The interviewees included Purdue Vice President Alan Must, who admitted that Purdue was "well aware" of concerns about its conduct: "We are well aware of detractors. For those individuals who think we're evil … I don't think there's anything we can do that is going to change their opinion."[18]

98. In 2012, the U.S. Senate announced an investigation into Purdue's unlawful deception of doctors and patients about the nature of its opioid products. The Senators warned of "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers" in a letter to the CEO of Purdue Pharma, Inc. and Purdue Pharma L.P.[19] The Senate letter specifically warned of the danger of higher levels of opioid dosage: "over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks while data suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses."[20]

---

[18] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, FORTUNE (Nov. 9, 2011), http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/.

[19] Letter from U.S. Senate Finance Committee to John H. Stewart, President and CEO of Purdue Pharma L.P. (May 8, 2012), https://www.finance.senate.gov/ imo/media/doc/Purdue_May_8.pdf (last visited Mar. 7, 2019).

[20] *Id.*

99.  The Senate letter also warned about Purdue's deceptive tactics with doctors and patients: "There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness."[21] The Senate specifically warned the directors and CEO that they were under scrutiny, demanding that Purdue present a set of "presentations, reports, and communications to Purdue's management team or board of directors from 2007 to the present."[22]

100.  In 2013, the *Los Angeles Times* reported that Purdue had created a list of 1,800 doctors suspected of recklessly prescribing its opioids over the past decade but had reported only 8% of them to authorities.  Purdue attorney Robin Abrams ("Abrams") gave multiple interviews to the newspaper.  Abrams was a Vice President of Purdue, and she signed Purdue's 2007 settlement agreement.  In 2013, she admitted that Purdue had the list and said with regard to Purdue's unwillingness to disclose the list: "I don't really want to open up an opportunity for folks [to] come in here and start looking and second-guessing."[23]

101.  Abrams and Purdue's directors had good reason to be concerned: the state of Kentucky had brought a lawsuit against Purdue for deceiving doctors and patients about the nature of its opioid products.  When Purdue's lawyers surveyed the local residents for potential jury service, one-third of respondents said they knew someone who had been hurt or had overdosed taking Purdue opioids, and 29% knew someone who had died. Purdue itself filed these findings in court.

---

[21] *Id.*

[22] *Id.*

[23] Scott Glover & Lisa Girion, *OxyContin maker closely guards its list of suspect doctors*, L.A. Times (Aug. 11, 2013), https://www.latimes.com/local/la-me-rx-purdue-20130811-story.html.

102. In 2014, Edward Mahony, the Executive Vice President, Chief Financial Officer and Treasurer of Purdue, announced that the Kentucky lawsuit was noteworthy enough to "jeopardize Purdue's long-term viability."[24] The Governor of Massachusetts declared the opioid crisis a public health emergency in the same year.

103. In 2016, in an attempt to stop the threatening spread of opioid overprescribing, the CDC published the *CDC Guideline for Prescribing Opioids for Chronic Pain*.

104. In 2017, the President of the United States announced that opioid use in the nation had risen to the level of a national public health emergency.

105. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO controlled the operation of Purdue's sales representatives. Director Richard Sackler testified that Purdue primarily promoted its opioids through its sales representatives and  that regular visits from representatives were the key to get doctors to continue to prescribe the drugs.  The board knew which drugs the sales representatives were to promote, the number of visits representatives made to doctors, how much each visit cost the company and the quarterly plans for sales visits.  The board approved specific hiring plans for their sales representatives, hiring directors and regional managers and creating sales territories for representatives to target doctors.

106. Documents obtained by the Massachusetts AG detailed Richard Sackler's intense day-to-day involvement.  For example, in January 2010, Richard Sackler asked sales staff for new customized reports.[25]  Staff complained to each other until Sales Vice President Russell Gasdia ("Gasdia") asked Stewart to intervene: "Can you help with this?  It

---

[24] Tracy Staton, *Addiction-riddled Kentucky out for blood in $1B suit against OxyContin-maker Purdue*, FiercePharma.com (Oct. 20, 2014), https://www.fiercepharma.com/pharma/addiction-  riddled-kentucky-out-for-blood-1b-suit-against-oxycontin-maker-purdue.
[25] *MA AG Complaint*, ¶288.

seems like every week we get one off requests from Dr. Richard." But neither Stewart nor anyone else could keep Richard out of sales. Days later, Richard was writing to a sales employee on a Saturday morning, ordering that his need to review the sales plan was "urgent" and should be satisfied "this weekend."[26]

107. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO oversaw the specific tactics used by sales representatives to sell opioids; for example, a board report encouraged the use of iPads during sales visits, which increased the average length of meetings to 16.7 minutes.

108. According to documents obtained by the Massachusetts AG, at a 2011 Launch Meeting for Butrans, an opioid introduced by Purdue that releases opioids into the body via skin patch, Richard Sackler met with sales representatives for several days to discuss how they would promote the new product.[27] Richard Sackler followed up with sales management to demand a briefing on how the sales visits were going in the field: "I'd like a briefing on the field experience and intelligence regarding Butrans. How are we doing, are we encountering the resistance that we expected and how well are we overcoming it, and are the responses similar to, better, or worse than when we marketed OxyContin tablets?"[28]

109. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO oversaw the promotional claims representatives used during sales visits. The directors and CEO reviewed reports that Purdue sales representatives were deceptively promoting

---

[26] *Id.*
[27] *Id.*, ¶328.
[28] *Id.*

opioids as an appropriate treatment for minor pain, among hundreds of other examples of unlawful marketing techniques in need of correction.

110. According to documents obtained by the Massachusetts AG, Richard Sackler demanded that he be sent into the field with sales representatives.[29]  Richard wanted a week shadowing Purdue sales representatives, two representatives per day. Gasdia reportedly appealed to Purdue's Chief Compliance Officer in horror, warning that Richard Sackler promoting opioids was "a potential compliance risk." Compliance replied: "LOL."  To make sure the Sacklers' involvement in marketing stayed secret, staff instructed: "Richard needs to be mum and anonymous."[30]

111. Richard Sackler indeed went into the field to promote opioids to doctors alongside a sales representative.   When he returned, Richard reportedly argued to Gasdia that a legally required warning about Purdue's opioids was not needed.  He asserted that the warning "implies a danger of untoward reactions and hazards that simply aren't there."   Richard insisted there should be "less threatening ways to describe Purdue opioids."[31]

112. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO oversaw Purdue's research, which in some cases contradicted the company's marketing. Company leadership received detailed and specific reports concerning Purdue opioids being used for "opioid-naïve" patients and patients with osteoarthritis.[32]

113. According to documents obtained by the Massachusetts AG, during a 2010 Purdue Board of Directors meeting, the board inquired whether sales representatives could sell more Butrans if they remained silent about failed clinical trials testing Butrans for patients

---

[29] *Id.*, ¶354.
[30] *Id.*
[31] *Id.*, ¶356.
[32] *Id.*, ¶309.

with osteoarthritis: "What can be said in response to a prescriber who asks directly or indirectly, 'can this product be prescribed for my patient with [osteoarthritis]?'   In responding are we required to specifically mention the failed trials in [osteoarthritis]?"

114. Plaintiff is informed and believes, and thereupon alleges, that company leadership was directly informed of "Reports of Concern" filed by sales representatives regarding high-prescribing doctors, as well as "field inquiries" in response to the reports.

115. According to documents obtained by the Massachusetts AG, in September 2009, a Purdue sales manager who had concerns about a potential pill mill to which Purdue was promoting opioids sent an e-mail to John Crowley ("Crowley"), Purdue's Executive Director of Controlled Substances Act Compliance: "I feel very certain this is an organized drug ring … Shouldn't the DEA be contacted about this?"[33] Purdue sat on this information for two years and only reported it to authorities *after* the pill mill doctor had been arrested and the Sacklers had arranged for lawyers in case Crowley was questioned.[34]

116. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO monitored sales representatives' e-mails.  Purdue had a policy of prohibiting sales representatives from communicating with doctors via e-mail; when Purdue found that some representatives had in fact e-mailed doctors, the company "investigated" the matter and told the board that the representatives had been disciplined and the matter would be discussed at the next board meeting.

117. Plaintiff is informed and believes, and thereupon alleges, that the directors oversaw Purdue's strategy to pay high-prescribing doctors to promote its opioids.  The board was aware of the amount paid to specific high prescribers and the return on investment it

---

[33] *Id.*, ¶334.
[34] *Id.*

received from these payments.  The board knew that Purdue allowed a gift spending limit of $750 per doctor per year and was told specifically that paying doctors was a high-risk activity that could result in improper off-label use or other promotional activity for opioids.

118. Plaintiff is informed and believes, and thereupon alleges, that the directors and CEO also managed Purdue's focus on encouraging patients to use higher and higher doses of opioids, leading to health issues, addiction and greater profits for the company.  Upon learning that sales of 40mg and 80mg strengths of OxyContin had fallen below sales targets, the board received multiple reports that public health authority initiatives to have doctors consult with pain specialists before prescribing high opioid doses were a "threat." The board oversaw measures to counteract against these initiatives and received reports in 2013 that attempts to encourage increased total daily doses had a positive impact on the company's bottom line.

119. In October 2017, Richard Sackler learned that insurance company Cigna had cut OxyContin from its list of covered drugs and replaced it with a drug from Purdue's competitor, Collegium.[35] Collegium had agreed to encourage doctors to prescribe lower doses of opioids, and Collegium's contract with Cigna was designed so Collegium would earn *less* money if doctors prescribed high doses.[36]  Cigna announced that opioid companies influence dosing: "While drug companies don't control prescriptions, they can help influence patient and doctor conversations by educating people about their medications."[37] According to an e-mail obtained by the Massachusetts AG, Richard

---

[35] *Id.*, ¶490.
[36] *Id.*
[37] *Id.*

Sackler's first thought was revenge: he immediately suggested that Purdue drop Cigna as the insurance provider for the company health plan.[38]

120. Plaintiff is informed and believes, and thereupon alleges, that the directors additionally oversaw Purdue's plan to keep patients hooked on opioids for longer periods of time through higher doses.  The board received thorough reports of how many patients remained on Purdue opioids for extended lengths of time, as well as internal documents that indicated patients on higher doses used the product for longer amounts of time, creating greater chances of addiction and abuse.  The board was presented with a plan to create workshops and give specific direction to representatives about this link, and that increasing opioid use was a focus point of the company.  The board was told in writing that encouraging higher doses "is a focal point of our promotion" and that sales representatives should push doctors to increase patient doses as soon as three days after initial treatment.  The board knew or should have known that this sales tactic was both deceptive and placing patients at high risk of addiction and overdose.

121. In January 2018, Richard Sackler received a patent for a drug to treat opioid addiction for which he had applied in 2007.[39] He assigned it to a different company controlled by the Sackler family instead of Purdue.[40]  Richard's patent application says opioids ***are*** addictive.[41]  The application calls the people who become addicted to opioids "junkies" and asks for a monopoly on a method of treating addiction.[42]

---

[38] *Id.*
[39] *Id.*, ¶493.
[40] *Id.*
[41] *Id.*
[42] *Id.*

122. Plaintiff is informed and believes, and thereupon alleges, that the directors also oversaw Purdue's use of "savings cards" to get patients on Purdue opioids for longer periods of time.  The board knew exactly how many thousands of cards were used each quarter, the return on investment, and the goal of the program: for patients "to remain on therapy longer."

123. Plaintiff is informed and believes, and thereupon alleges, that the directors also oversaw Purdue's targeting of prescribers without special knowledge of opioids, as they were the most likely to respond to Purdue's sales techniques.  Purdue proceeded with this strategy despite the DEA expressing concern that Purdue was marketing its opioids to doctors who were not appropriately trained in pain management. Purdue's leadership also oversaw a strategy of targeting elderly patients, using images of older patients to target healthcare professionals who practiced in long-term care.  The directors and CEO knew or should have known both that this strategy was deceptive and that targeting doctors who lacked special training in pain management and elderly patients increased the risk of addiction and overdose.

124. Plaintiff is informed and believes, and thereupon alleges, that Purdue's leadership was also aware of a plan to steer patients away from safer pain-management medicines, which involved efforts to emphasize the danger of acetaminophen-based pain medication to the liver.  These efforts included deceptive websites that the New York Attorney General specifically held to be misleading in specific sections.

125. Plaintiff is informed and believes, and thereupon alleges, that Purdue's leadership also oversaw the response to thousands of harm reports from patients, in one case receiving over 5,000 complaints in a single quarter.

126. Plaintiff is informed and believes, and thereupon alleges, that Purdue possesses documents that show each of the reports mentioned above was sent to every individual defendant on the board, including every Sackler Defendant with a board position.

127. These defendants' duplicitous and unlawful acts have damaged, and continue to damage, the State of Michigan in a substantial amount to be determined at trial.  Damages incurred by the County of Sanilac include: (a) the costs of treating opioid addiction, including addiction treatment, emergency room visits and inpatient and outpatient treatment; (b) the costs of maintaining harm reduction, overdose prevention and education on the dangers of opioid use; (c) special costs incurred by the County of Sanilac for the public safety, health and welfare of its citizens; and (d) the economic harm to the County of Sanilac resulting from the opioid addiction epidemic.

**F. Additional Allegations with respect to Defendant Anda, Inc.**

128. One of the prominent suppliers of opioid products in the State of Michigan was the Harvard Drug Group, which operated a distribution facility in Livonia, Michigan.  In June of 2010, the U.S Department of Justice Drug Enforcement Administration brought an enforcement action against the Harvard Drug Group due to its failure to comply with suspicious order monitoring obligations under the Controlled Substances Act.

129. Defendant Anda, Inc. was a significant supplier of opioid products to the Harvard Drug Group.  As its supplier, Anda failed to take steps to adequately review the ordering pattern of the Harvard Drug Group or otherwise "know its customer" to determine whether the Harvard Drug Group's ordering, and sales, of opioid products were suspicious and likely to lead to diversion of opioid products.

Dated: March 16, 2019                    Respectfully submitted,

*/s/ Paul J. Pennock*
Paul J. Pennock
Ellen Relkin
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
Tel: (212) 558-5500
Email: ppennock@weitzlux.com
Email: erelkin@weitzlux.com

Paul F. Novak
**WEITZ & LUXENBERG, P.C.**
Fisher Building
3011 West Grand Boulevard
Suite No. 2150
Detroit, MI 48202
Tel: (313) 800-4170
Email: pnovak@weitzlux.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this **16th** day of **March, 2019**, I electronically filed the foregoing

**Short Form For Supplementing Complaint and Amending Defendants and Jury Demand** on

the CM/ECF filing system in Case Number 1:18-op-45352-DAP in the Northern District of Ohio,

thereby sending notice of said filing to all counsel of record in this matter.


*/s/ Jaime M. Farrell*
Jaime M. Farrell
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
Tel: (212) 558-5500
Email: jfarrell@weitzlux.com